UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIELLE WEEKES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>OHIO NATIONAL LIFE ASSURANCE CORPORATION, a foreign entity, and JOHN DOES, individually, DOES I through X, and JOHN DOE BUSINESS ENTITIES, DOES 1 through X,<br><br>Defendants. | Case No. 1:10-cv-566-BLW<br><br>**MEMORANDUM DECISION AND ORDER ON SUMMARY JUDGMENT MOTIONS** |

**INTRODUCTION**

The Court has before it cross-motions for summary judgment. Plaintiff Danielle Weekes moves for summary judgment of her breach of contract claim (Dkt. 16). Defendant Ohio National Life Assurance Corporation cross-moves for summary judgment of all plaintiff's claims (Dkt. 22). The Court heard argument on November 21, 2011 and now issues its decision.

This litigation arose because plaintiff's husband died while he had two separate life insurance policies in place. Ohio National denied coverage under its policy,

contending that Mr. Weekes was required to terminate his other life insurance before the Ohio National policy became effective. There is no such condition precedent in the contract, however, and the Court finds no grounds to support a rescission of the policy. The Court will therefore grant plaintiff's motion for partial summary judgment on the breach of contract claim. Ohio National, on the other hand, is entitled to summary judgment of plaintiff's bad faith and fraud claims.

### FACTS[1]

On October 27, 2009, Bart Weekes applied for life insurance with Ohio National. *Life Ins. App., Ex. B to Hilverda Aff. (Dkt. 16-4)*, at 2. One section of the application, entitled "*Other Coverage/Replacement Information*," asks about other life insurance policies:

    a.    Do you have or are you applying for other life insurance?

    b.    Will proposed policy replace or cause change in any existing policy?

        If either 6a or 6b is answered "Yes" list all types of insurance below, and indicate whether the proposed policy will replace or cause change in any existing policy.

*Id.*

Directly below these questions are several blank lines with column headings prompting the applicant to provide additional information. Mr. Weekes filled in the blank

---

[1] The Court's recitation of the factual background of this dispute is limited to those facts necessary to the Court's decision. Other factual issues, although discussed at length in the parties' briefing, will not be addressed.

lines as follows – with the italicized text representing the handwritten responses:

| Company or Source | Type of Insurance | Amount of Insurance | Will it Be Replaced? | Replacement Date |
|---|---|---|---|---|
| *Beneficial Life* | *UL* | *2,000,000* | [x] Yes [ ] No | — |
| | | | | |

These answers correctly reflect the fact that Mr. Weekes had a $2 million universal life insurance policy with Beneficial Life Insurance Company. *See Hansen Aff., Ex. D to Hilverda Aff. (Dkt. 16-6)* ¶¶ 5, 10. At the time he filled out this application, Weekes intended to replace his Beneficial Life insurance policy and roll the value of that existing policy into a new policy. *Id.* ¶ 10. This type of exchange is referred to in the industry as a 1035 exchange, in reference to the Internal Revenue Code section governing such transactions. *See* I.R.C. § 1035 (governing "certain exchanges of insurance policies").

On November 20, 2009 – a few weeks after Mr. Weekes completed the application – an employee from agent David Hansen's[2] office informed Ohio National that there was no cash surrender value in the "other UL policy that is being replaced, so this is not a 1035 exchange." *Ohio Nat'l AWD History, Ex. B to Hilverda Aff. (Dkt. 16-4)*, at 259. By that time, Hansen had learned that the Beneficial Policy had no surrender value to Mr. Weekes. *Hansen Aff.* ¶ 10. So he gave what he considered to be common sense advice to Mr. Weekes – rather than waste "paid-up" insurance, he advised Mr. Weekes to simply

---

[2] The parties dispute whether Hansen is Weekes' agent, or Ohio National's agent. However, the Court has concluded that it need not resolve this dispute to resolve the pending motions.

stop paying the premiums on the Beneficial policy and let it lapse in due time for non-payment. *Id.* ("Because there was no surrender value in the Beneficial policy I instructed Bart to just let the policy lapse and not make any further premium payments. I knew and told Bart that the Beneficial policy would lapse in due time for non-payment. In my opinion that is a practical and acceptable way to replace a policy.")

A few days later, on November 23, Ohio National sent an email to Hansen: "[W]e can offer up to $2,000,000 life at preferred. This assumes replacement of the Beneficial Life UL policy. Should we approve?" Hansen's office responded the same day, "Yes please!!!!!" *Spears Aff. (Dkt. 22-4)* ¶ 8 and Ex. D thereto. Ohio National issued the policy that same day and delivered it to Weekes on November 25, 2009. *See Ex. A to Hilverda Aff. (Dkt. 16-3)* ¶ 9.

On November 26, 2009, Ohio National's underwriting department emailed Hansen asking him to verify, among other things, whether the policy would involve a 1035 exchange:

> The application submitted indicates you will be doing a replacement. Please submit the required replacement form 5486-ID. [¶] Please submit the required Ohio National Client Replacement Information form 6487. [¶] Please verify if the above policy will involve a 1035 exchange.

*Dkt. 16-4* at ON000205. *See* Nov. 26, 2009

Thereafter, on December 8, 2009, Mr. Weekes signed a Request for Policy Surrender form, which directs Beneficial Life to "cancel the above listed policy and send a check for the full surrender amount to . . . Ohio National . . . ." *Id.* at ON000254.

Weekes then sent this form to Ohio National, although it is unclear why he did so because at that point, both contracting parties were aware there would be no 1035 exchange. It appears this form was sent as part of a larger submittal because at around the same time, Mr. Weekes sent amended responses to other parts of the application.³ *See Hansen Aff, attached as Ex. D to Affidavit of Counsel (Dkt. 16-6)* ¶ 10 ("Bart signed the appropriate forms including a surrender form which was sent at some point by my office to Ohio National."). Ohio National did not do anything with the surrender form; it says it could not use these forms to surrender the policy, though it does not explain why this is so. *See Neal Aff. (Dkt. 22-3)* ¶ 8 ("The form could not be utilized by Ohio National to terminate the Beneficial Life policy.").

Meanwhile, in accordance with his plan to let his Beneficial Life policy lapse for non-payment, Mr. Weekes did not pay the October 2009 premium on his Beneficial Life policy. The policy nonetheless remained in effect. As a result, when the Ohio National policy became effective, Mr. Weekes had two life insurance policies in place.

A few months later, in April 2010, Mr. Weekes died in a snowmobiling accident. Beneficial Life paid the $2 million policy amount. Ohio National, however, refused to pay on the basis that Mr. Weekes had made "incorrect or misrepresented" statements in his application. The denial letter explains:

> As a result of our investigation, we obtained information that the statements

---
³ The amendments are not directly relevant to this litigation.

> Mr. Weekes furnished on his application were incorrect or misrepresented, as he did not replace his Beneficial Life Insurance Policy in the amount of $2,000,000.00. Rather, this policy remained in force in addition to the $2,000,000.00 policy issued by Ohio National.

*July 10, 2010 Letter (Dkt. 16-5)*, at ON000106-07. The denial letter goes on to explain that in accordance with its underwriting guidelines, Ohio National would not have sold $2 million of life insurance to Mr. Weekes if he already had another $2 million policy in place. *Id.*

## LEGAL STANDARD

One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable

inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). And a court is not obligated to take the non-movant's version of events as true when the account is blatantly contradicted by video evidence. *Scott v. Harris,* 550 U.S. 372, 378-81 (2007).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000). This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324. However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen,* 237 F.3d at 1029. Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

# ANALYSIS

1. **Breach of Contract**

The Court will first resolve the parties' cross-motions for summary adjudication of the breach of contract claim.

    A. **Ohio National Cannot Rescind the Policy Based on Misrepresentations or Incorrect Statements in the Application**

Ohio National seeks to rescind Mr. Weekes' life insurance contract in accordance with Idaho Code § 41-811. This statute deals with representations made in the insurance application and implicitly permits insurance companies to deny coverage based on certain types of statements.[4] For example, denial would be permissible if the insured made

---

[4] In full, this statute provides:

**§ 41-1811. Representations in applications**

All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(a)      Fraudulent; or

(b)      Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(c)      The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

"incorrect statements" in the application that were "material . . . to the insurance company's acceptance of risk," or caused the company to issue a policy that, in good faith, it would not have issued had the "true facts" been known. *Id.*

Ohio National contends Mr. Weekes made "incorrect statements" in the application regarding the Beneficial Life policy. More specifically, Ohio National essentially argues that Mr. Weekes represented he would terminate the Beneficial Life policy before the Ohio National policy would take effect so that there would be no period of duplicate coverage.

But there are no such representations in the application, nor could there be because the application does not contain targeted questions that would elicit this information. Instead, Mr. Weekes answered general questions about "replacement." He represented that the Ohio National policy would replace the Beneficial Life policy, but he gave no indication as to when or how that replacement would occur. As noted, in the blank asking for a "Replacement Date," Weekes just put a dash mark.

To find an "incorrect statement" on this application, the Court would have to (1) ignore the dash mark, and (2) decide that the word "replace" unambiguously means simultaneous replacement only. This argument fails at the outset because Ohio National's application does not just ask *whether* the new policy would replace an existing one, but it also asks *when* that would happen. If "replacement" unambiguously meant simultaneous replacement only, there would be no need to ask about the "replacement date." The fact

that Ohio National did ask the question actually supports the contrary position – that "replace" can mean something other than simultaneous replacement. Further, to the extent there is any ambiguity regarding exactly what Ohio National was asking, the ambiguities must be construed against Ohio National. "Since it frames the application questions, the company must keep them free from misleading interpretations and the consequence of its failure to do so is that all ambiguities in the application will be construed against the insurer." *Wardle v. Int'l Health & Life Ins. Co.*, 551 P.2d 623, 626 (Idaho 1976).

If Ohio National wished to make the effectiveness of its policy contingent upon termination of the Beneficial Life policy, it could have clarified that point in its contract or asked more specific, targeted questions in its application. In this regard, *Donaldson v. Farm Bureau Life Insurance*, 440 N.W. 2d 187 (Neb. 1989) is instructive. Ohio National relies on this case because the court held that an insurance company had no duty to perform under a contract because a prior policy had not been terminated. *Donaldson*, however, is distinguishable and ultimately supports a ruling in plaintiff's favor.

In *Donaldson*, a health insurance application expressly "caution[ed] that coverage would take effect 'only when the application is approved by' Farm Bureau and that a 'contract will not be offered when there is other major medical or hospital surgical coverage in effect, which is not being replaced, or whenever there is a duplication of benefits which would result in excessive coverage.'" *Id.* at 188. The applicants did not

cancel their pre-existing insurance, however, and Farm Bureau argued that there was no contract due to failure of a condition precedent. *Id.* The key issue presented in that case was whether Farm Bureau had waived this express condition precedent by subsequent communications. *See id.* at 190-91.

*Donaldson* is thus not "comparable" to this case, as Ohio National suggests. The application in that case was clear – it explained that a contract would not be offered while other major insurance was in effect. There was no such clarity here. Again, Ohio National cannot rely on the word "replacement" or "replace" to mean immediate replacement or termination only.

The Court's interpretation of the word "replace" is supported by an Idaho insurance regulation, which broadly defines "replacement" to include situations where the insured converts an existing policy to reduced, paid-up insurance:

> Replacement means any transaction by which new life insurance or a new annuity is to be purchased, and it is known or should be known . . . that existing life insurance or an annuity has been or is to be:
>
> 01.   Termination. Lapsed, forfeited, surrendered, or otherwise terminated.
>
> 02.   Conversion or Continuance. *Converted to reduced paid-up insurance, continued as extended term insurance, or otherwise reduced in value by the use of nonforfeiture benefits or other policy values.*

Idaho Admin. Code r. 18.01.41.004 (emphasis added).

Ohio National argues that this regulation is irrelevant because it is part of a regulatory scheme drafted in regulate the attempt by some insurance companies to earn

more commissions by persuading insureds to replace existing policies with a new policy. *See id.* r. 18.01.41.001. The regulations require that an insurance company issuing a new policy to a consumer must notify the consumer's current insurer about the potential issuance of a replacement policy; this, in turn, would give the current insurer an opportunity to contact the consumer and explain that they might be losing value by changing to a different insurance company. *Id.* r.18.01.41.012.02.d.

After reciting these broad regulatory purposes, Ohio National leaps to the conclusion that the regulation's definition of the word "replacement" has no bearing on this dispute. But these regulations are directly applicable because they require Ohio National to include in its applications the very replacement questions at issue here. *See* Idaho Admin. Code r. 18.01.41.013 (requiring insurers to include "with or as part of each completed application for life insurance . . . a statement signed by the applicant as to whether such proposed insurance will replace existing life insurance . . . ."). So the regulation's definition of "replacement" seems directly relevant to this dispute – particularly where Ohio National lobbies for an extremely narrow definition of "replacement" that is at odds with the regulation.

In summary, the life insurance application does not contain any incorrect statement regarding the replacement of the Beneficial Life policy. Accordingly, there is no basis for

rescission under Idaho Code § 41-811.[5]

Plaintiff also argues there can be no misstatement here because Mr. Weekes' statements about replacement relate to his then-present intent to do something in the future. Plaintiff argues that under "well-settled Idaho law a present representation to do something in the future cannot form the basis of an action for fraud or misrepresentation." Dkt. 16-1 at 11-12 (citing *Country Cove Dev. v. May* 150 P.3d 288 (2006); *Sharp v. Idaho Inv. Corp.*, 504 P.2d 386 (Idaho 1972); *Mitchell v. Barendregt*, 820 P.2d 707 (Idaho Ct. App. 1991)). Ohio National contends these principles are irrelevant because Mr. Weekes' made incorrect statements – not fraudulent misrepresentations. Ohio National relies heavily on a Georgia case, *White v. American Family Life Assurance Co.*, 643 S.E. 2d 298 (Ct. App. Ga. 2007) to support this argument. *See Defendants' Mem. (Dkt. 22-1)*, at 11-13.

Ohio National's argument lacks merit. There is a fundamental difference between a statement that is demonstrably incorrect when made, as opposed to a statement about something a person plans to do in the future. *See Country Cove*, 150 P.3d at 294 ("Opinions and predictions cannot form the basis of a fraud claim because they do not speak to matters of fact. An exception to the general rule exists where a false prediction

---

[5] Because there was no misrepresentation, the Court will not address plaintiff's alternative argument that Hansen's knowledge regarding the Beneficial Life policy (and its planned lapse) can be imputed to Ohio National through agency principles. This argument was made in the alternative, based on the assumption that there was a misrepresentation or incorrect statement in the application. *See Plaintiff's Mot. Memo.* (Dkt. 16-1). at 13-14.

is given with intent to mislead."). The life insurance application essentially asks about the applicant's intentions to replace; it does not inquire about extant facts in this regard. So, to that extent, the rationale of the authorities plaintiff cites is relevant by analogy. That is, it does not make sense to treat a statement of intent as a statement of fact, and to then judge the truth of that statement with the benefit of hindsight, based on conduct that occurred after the statement was made. Under such analysis, the statements about "replacement" in the life insurance application are more or less treated as a warranty, or a contractual obligation on Weekes' part, to replace the policy.

Notably, the *White* case Ohio National relies upon did not involve a statement of intent. There, the Whites applied for health insurance and in the application they innocently – but falsely – stated that neither had previously been diagnosed or treated for impaired kidney function. 643 S.E. 2d at 299. The application provided that if the Whites answered, "Yes" to the question, the policy would not cover the person who had been so diagnosed or treated. *Id.* In fact, Mr. White had previously received treatment for impaired kidney function for several years, although the Whites wrongly assumed the treatment related only to his diabetes; they were unaware of kidney problems. *Id.* Construing a Georgia statute substantially identical to Idaho Code § 41-811, the court determined that the insurance company had properly rescinded the contract based on the innocent, incorrect statements. *Id.* at 301-02. *White*, however, is distinguishable because the Whites made an incorrect statement about an existing fact on their application. There

is no such statement here.

B.    **Rescission Based on Mutual Mistake**

Ohio National also argues that the contract may be rescinded due to a mutual mistake. "Rescission is an equitable remedy which ideally brings the parties to their pre-contract status quo. It abrogates the contract and restores parties to their original position, as if the contract had never occurred. Rescission is the proper remedy where there is a mutual mistake of fact that is material or fundamental to the contract." *O'Connor v. Harger Constr., Inc.*, 188 P.3d 846, 851 (Idaho 2008) (internal citations omitted). "[M]utual mistake permits a party to rescind or modify a contract as long as the mistake is so substantial and fundamental as to defeat the object of that party." *Primary Health Network, Inc. v. State Dept. of Admin.*, 52 P.3d, 307 312 (2002). The party alleging mistake bears the burden of proving, by clear and convincing evidence, that both parties were mistaken. *O'Connor,* 188 P.3d at 851.

Ohio National argues that both parties were operating under the mistaken belief that the new policy not only would replace the Beneficial Policy, but that it had to immediately replace the policy such that there would be no period of duplicate coverage. It is undisputed that at the time Mr. Weekes filled out his life insurance application, he contemplated a 1035 exchange. But Ohio National knew there would be no 1035 exchange before the contract became effective, and, moreover, there is no evidence indicating Weekes assumed the replacement *had* to be a 1035 exchange, or even that the

replacement had to be an immediate replacement. There is nothing in the application that would have alerted him to that fact. Further, although Ohio National insists it was critical Mr. Weekes not be over-insured, there is no evidence that this concern was communicated to Mr. Weekes, or that Mr. Weekes was operating under the assumption that he could only carry $2 million worth of life insurance. Thus, Ohio National has shown a unilateral mistake – not a mutual one. "A party to a contract 'who makes a mistake unilaterally cannot rescind or modify the agreement absent' misrepresentation or knowledge of the mistake by the other party." *Cline v. Hoyle & Assoc. Ins., Inc.*, 697 P.2d 1176, 1178 (Idaho Ct. App. 1985) (citation omitted).

Based on these undisputed facts, there are no grounds for rescinding Ohio National's insurance contract with Mr. Weekes. The Court will therefore grant plaintiff's motion for partial summary judgment on the breach of contract claim.

**2.     Bad Faith**

Ohio National, on the other hand, is entitled to summary judgment on plaintiff's bad faith claim. To recover on this claim, Ms. Weekes must show:

(1)     the insurer intentionally and unreasonably denied or withheld payment;

(2)     the claim was not fairly debatable;

(3)     the denial or failure to pay was not the result of a good faith mistake; and

(4)     the resulting harm is not fully compensable by contract damages.

*Robinson v. State Farm Mut. Auto. Ins. Co.*, 45 P.3d 829, 832 (2002).

Focusing on the fourth element – damages – the bad faith claim fails because the undisputed facts show that plaintiff will be fully compensated by contract damages. Ms. Weekes testified that other than her claim for $2 million from Ohio National, she has not been otherwise harmed. *D. Weekes Dep., Ex. C to Diddle Aff. (Dkt. 22-10),* at 40. She also testified that she has not suffered any substantial emotional distress, *id.* at 38-39, and there is no evidence of any financial distress. *Cf., e.g., Weinstein v. Prudential Property & Cas. Ins. Co.*, 233 P.3d 1221, 1246 (Idaho 2010) (Plaintiffs alleged "'unnecessary and substantial emotional distress and mental anguish, [and that] their credit has been damaged and their family finances were damaged.'"). Plaintiff does complain that she has been forced to file a lawsuit and hire an attorney, but Ohio National concedes that attorneys' fees and costs are recoverable in a breach of contract action in Idaho. *See Ohio National's Reply (Dkt. 38)*, at 10 ("attorneys' fees, interest and costs . . . are obviously recoverable in a contract claim in Idaho"). *See also* Idaho Code § 41-1839(1). Under these undisputed facts, Ms. Weekes cannot proceed on her bad faith claim.

3.     **Fraud and Misrepresentation**

The Court will also grant Ohio National's motion for summary judgment on plaintiff's claim for "fraud and misrepresentation." *See Compl. (Dkt. 1-1)* at 6 ("Count Three – Fraud and Misrepresentation"). Ohio National attacked this claim in its motion and plaintiff did not respond. The Court finds no facts that would support this claim.

**IT IS ORDERED:**

1.  Plaintiffs' motion for partial summary judgment on her breach of contract claim is **GRANTED**.

2.  Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part. It is granted with regard to Plaintiff's bad faith and fraud claims, but is denied in all other respects.

DATED: **November 21, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge