# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIELLE WEEKES, an individual,<br><br>                       Plaintiff,<br><br>       v.<br><br>OHIO NATIONAL LIFE ASSURANCE<br>CORPORATION, a foreign entity, and<br>JOHN DOES, individually, DOES I<br>through X, and JOHN DOE BUSINESS<br>ENTITIES, DOES 1 through X,<br><br>                  Defendants. | Case No. 1:10-cv-566-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Three motions are pending in this case: (1) plaintiff Danielle Weekes moves to amend her complaint to add a punitive damages claim (Dkt. 17); (2) defendant Ohio National Life Assurance Corporation moves to strike plaintiff's expert affidavit and to exclude plaintiff's expert from testifying at trial (Dkt. 25); and (3) Ohio National moves, alternatively, to strike portions of plaintiff's expert report (Dkt. 24). The Court finds that the decisional process would not be aided by oral argument, and will resolve these motions after consideration of the parties' written submissions. D. Idaho L. Civ. R. 7.1(d).

For the reasons expressed below, the Court will grant the motion to amend the complaint. The Court will also grant Ohio National's motion to exclude plaintiff's expert from testifying. Ohio National's alternative motion to exclude portions of the expert's report is thus moot.

## BACKGROUND[1]

Plaintiff's husband, Bart Weekes, died while he had two separate life insurance policies in place. Ohio National denied coverage under its policy, contending that Mr. Weekes was required to terminate his other life insurance policy before the Ohio National policy became effective. There is no such condition precedent in the contract, however, which prompted Ms. Weekes to sue the company for breach of contract, bad faith, and fraud.

Recently, this Court summarily adjudicated the breach of contract claim in Ms. Weekes' favor and the fraud and bad faith claims in Ohio National's favor. The case is not over yet though because Ms. Weekes seeks to amend her complaint to add a punitive damages claim.[2]

Before resolving the motion to amend, the Court will address Ohio National's motions to strike plaintiff's expert testimony. As will be discussed, the existence of

---

[1] A fuller version of the facts is contained in the Court's November 21, 2011 Order. *See* Dkt. 46.

[2] Under Idaho law, plaintiffs cannot simply seek punitive damages in their civil complaints. They must instead file a pretrial motion to amend the complaint to include a prayer for punitive damages. *See* Idaho Code § 6-1604(2).

expert testimony is one factor Idaho courts consider in determining whether plaintiffs should be permitted to seek punitive damages.

## MOTION TO EXCLUDE

Ohio National asks the Court to strike Tim Terry's entire expert report and to exclude Terry from testifying at trial on the grounds that Mr. Terry did not actually prepare his expert report.

Federal Rule of Civil Procedure 26(a)(2) requires parties to disclose the identity of their expert witnesses and to include a written report. Fed. R. Civ. P. 26(a)(2)(A)-(B). Among other requirements, the written report must be "prepared and signed" by the witness. Fed. R. Civ. P. 26(a)(2)(B).

Failure to disclose an expert witness or provide the required information results in exclusion of the witness "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The burden of proving an excuse is on the party facing sanctions, and district courts have "particularly wide latitude" in determining whether discovery sanctions should issue. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001).

On July 15, 2011, plaintiff timely identified Terry as her expert. She also supplied a lengthy summary of Terry's anticipated testimony – entitled "Expert Witness Disclosure" – but Terry did not sign the document. Plaintiff's counsel did. *See Expert Witness Disclosure, Ex. A to Diddle Aff.*, Dkt. 48.

On August 9, 2011, Ohio National moved to strike the expert report because Terry

had not prepared and signed the report. *Motion to Strike Plaintiff's Expert Witness Disclosure and Exclude Expert*, Dkt. 11. That same day, plaintiff supplied an affidavit signed by Terry, and Ohio National withdrew its motion.

Ohio National deposed Terry a few weeks later. He testified that he had not formed opinions regarding the case as of July 15, 2011 – the date plaintiff's counsel submitted the expert disclosure. Terry's deposition testimony prompted Ohio National to file the instant motion, which again seeks to exclude Terry as an expert. After this motion was on file, Terry submitted corrections to his deposition testimony. In the corrections, Terry changed his testimony regarding his conversations with counsel before July 15.

Ohio National argues that these corrections must be stricken under a corollary to the sham affidavit rule. Alternatively, Ohio National argues that even if the corrections are allowed, Terry's expert report should be stricken because Terry did not "prepare" his expert report within the meaning of Rule 26. The Court agrees on both counts.

**1.     Corrections to Deposition Testimony**

Turning first to the deposition testimony, the relevant testimony concerns two telephone conversations between plaintiff's counsel and Terry during the spring and summer of 2011 – before plaintiff submitted the July 15 expert disclosure. These conversations were recorded in Terry's time sheets as having occurred on May 18 and July 12. Mr. Terry testified about the May 18 conversation as follows (with the corrections shown in italics):

Q     Now, I want to go back to your time entry on 5/18, the first time entry. At

the end it says 'teleconference with counsel."  Do you see that?

A.    Oh, yes, I do.

Q.    What do you recall of that telephone call?

A.    Nothing specific stands out. Chronology of the case, the framework of the case, what happened when, discussion of each of these elements in either brief or-

Q.    Did you express any of your opinions in that conference?

A.    I had no opinions at that point.

*Corrected Testimony:  I had developed a number of viewpoints about the case which I expressed to counsel. My opinions were finalized later based upon all the materials provided to me – such opinions were expressed in my affidavit.*

*Terry Dep*., at 28:13-23 (as quoted in Ohio National's Reply, Dkt. 37, at 4); *Ex. A to*

*Terry Aff.*, Dkt 34-1 (corrections to deposition).

Mr. Terry testified about the July 12, 2011 conversation with plaintiff's counsel as

follows:

Q.    I want to come down to 7/12, the 7/12 entry.

A.    Yes, sure.

Q.    And it says "teleconference with counsel."

A.    Yes.

Q.    What do you recall of that conversation?

A.    I can't really splice it out of there and indicate what the topic was. From looking at the sequence of review of material, it most probably included the discussion of the depos, depositions.

Q.     Did you express any of your opinions in that conversation?

A.     I don't recall having developed opinions as yet.

> *Corrected Testimony: I had developed a number of viewpoints about the case which I expressed to counsel. My opinions were finalized later based upon all the material provided to me – such opinions were expressed in my affidavit.*

*Terry Dep*., at 28:24 to 29:10; *Ex. A to Terry Aff. re Dep. Testimony*.

Federal Rule of Civil Procedure 30(e) permits deponents to change the "form or substance" of the deposition transcript. The Ninth Circuit has narrowly interpreted this rule, however, holding that "Rule 30(e) is to be used for corrective, and not contradictory, changes." *Hambleton Bros. Lumber Co. v. Balkin Enters.*, *Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005).

In *Hambleton Brothers Lumber Co. v. Balkin Enterprises*, *Inc.*, 397 F.3d 1217 (9th Cir. 2005), the deponent made several factually significant changes to his deposition testimony in an effort to fend off summary judgment. *Id.* at 1226. For example, where he had originally answered "I don't know" to a key question, he corrected the deposition transcript with a detailed, succinct answer supporting his theory of the case.[3]

---

[3] The testimony was as follows:

Q:     Specifically what conduct did Mr. Ballinger take that improperly dissolved Balkin Enterprises?

A:     I don't know.

> *Submitted correction: Ballinger in the dissolution of Balkin distributed assets of Balkin, the Fruitland property, that should not have been distributed, and he made me believe, in the 1996/1997 telephone conversation, that Balkin was still*

Significantly, the deponent did not submit any reasons whatever for the changes. A statement of reasons is required under Rule 30(e) and is a crucial component of a correction because it "permits an assessment concerning whether the alterations have a legitimate purpose." *Id.* at 1224-25. The *Hambleton* deponent's failure to explain his changes supported a conclusion that the changes were not corrections at all, but instead "purposeful rewrites tailored to manufacture an issue of material fact . . . to avoid a summary judgment ruling . . . ." *Id.* at 1225. The court thus invoked the sham affidavit rule to strike the rewrites – despite the fact that Rule 30(e) expressly allows corrections to the "substance" of deposition testimony. *Id.*

This Court does not interpret *Hambleton* to mean that deponents can never change the substance of their testimony. Such a rigid rule directly contradicts the governing statutory language and is also contrary to the authority *Hambleton* invoked. For example, *Hambleton* cited *Kennedy v. Allied Mutual Insurance Co.*, 952 F.2d 262 (9th Cir. 1991), which, in turn, explained that

> the *Foster-Radobenko* rule [*i.e.,* the sham affidavit rule[4]] does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. Rather, the *Radobenko* court was concerned with "sham" testimony that flatly contradicts earlier testimony in an attempt to "create" an issue of fact and

_____

> *in existence and still owned the Fruitland property, which was untrue.*

> 397 F.3d at 1225 n.6.

[4] *Foster-Radobenko* refers to two Ninth Circuit cases establishing the sham affidavit rule. *See Foster v. Arcata Assoc.,* 772 F.2d 1453, 1462 (9th Cir. 1985); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543-44 (9th Cir. 1975).

avoid summary judgment.  Therefore, before applying the *Radobenko* sanction, the district court must make a factual determination that the contradiction was actually a "sham."

*Id*. at 266-67.

Here, Terry's deposition testimony is clear enough to conclude that the errata is a flat contradiction.  He originally said he did not specifically recall what was discussed during the two telephone conversations at issue.  In the errata, Terry now says he does indeed remember what was discussed (his "viewpoints" regarding the case).  Terry does not explain how or why he now remembers these conversations in more detail.  Nor does Terry indicate that he misunderstood some aspect of the question, or that he did something to jog his memory.  In her opposition brief, plaintiff argues that "Mr. Terry took those questions to mean final opinions contained in his affidavit, and answered the questions [about whether he had formed opinions] in the negative."  Dkt. 34, at 2-3.  Mr. Terry, however, did not provide such an explanation in his errata.  Instead, the stated reason for the change is basically no reason at all – Terry indicated only that he made the change "to clarify the record."  *Ex. A to Terry Aff.*, Dkt. 34-1.  Further, while plaintiff's argument might explain why Terry said he had no opinions (preliminary or otherwise) before he signed his August 9, 2011 affidavit, he has not explained why he now remembers his conversations with counsel in more detail.  The timing of the errata also raises concerns.  Terry did not make these changes until he was threatened with

exclusion.[5]

All these facts combined – the flat contradiction; the failure to adequately explain the contradiction; and the timing of the correction – lead the Court to conclude that the errata is a sham. And although the sham affidavit rule developed in the context of summary judgment proceedings, the same logic applies here. Experts should not be permitted to change their testimony solely to avoid exclusion. The Court will therefore disregard the corrections in evaluating Ohio National's motion to strike Terry's expert report and to exclude Terry from testifying.

## 2.      Terry's Obligation to Prepare the Expert Report

The next issue is whether Terry "prepared" the expert report. As already noted, Rule 26 obligates the experts to "prepare and sign" their reports. The advisory committee notes amplify the intended meaning of the phrase "prepared and signed by the witness," explaining that a report can be "prepared" by an expert witness even if counsel has aided the witness. Specifically, the advisory committee notes provide:

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Fed. R. Civ. P. 26(a)(2)(B) (1993 advisory committee notes). Given this amplification, if

---

[5]   The top of the errata shows a date of  "9/19/11," but Terry did not sign the errata until October 17, 2011 – roughly three weeks after Ohio National filed its September 26, 2011 motion to exclude. *See Ex. A to Terry Aff.*, Dkt. 34-1.

counsel acts as a scrivener, and the expert supplies the substantive content for the written report, the report is nonetheless "prepared" by the expert within the meaning of the rule. *See, e.g, Crowley v. Chait*, 322 F. Supp. 2d 530, 543-45 (D.N.J. 2004); *Wilderness Dev., LLC v. Hash*, 2009 WL 564224, at \*4 (D. Mont. 2009) (even if the expert does not put pen to paper, a report may still be adequate if "the report in substance, is that of the expert, the expert provides substantial input in the preparation of the report, and counsel prepares the report based on extensive discussions with the expert") (citing *Crowley*, 322 F. Supp. 2d at 543-45).

In this case, it is undisputed that counsel prepared and submitted the July 15, 2011 expert disclosure *before* Terry finalized his opinions. (This is true even if the Court allowed the errata discussed above.)  Only later did the expert essentially adopt this disclosure as his own report, when he signed an affidavit on August 9, 2011.

This sequence of events is troubling, because it so strongly suggests that counsel provided the substantive leadership regarding the content of the expert's opinions, rather than the expert himself.  After all, counsel felt comfortable submitting the expert's opinions before the expert himself had finally determined what his opinions would actually be.

Terry indicates he was substantively involved in the preparation of the later, August 9 expert report.  But the earlier report – prepared by counsel – taints the later report because the expert simply adopted the expert report counsel had already drafted. There is no substantive difference in the two reports, and they are sometimes verbatim,

even including one similar typographical error.

Mr. Terry's report is not as egregious as the reports discussed in the cases Ohio National cites. For example, in *Stein v. Foamex International, Inc.*, 2001 WL 936566, at *5 (E.D. Pa. 2001), the expert "never claimed to have played any substantial role in" preparing the report, "other than signing it." Here, Terry logged over 12 hours on this case and had two teleconferences with counsel before counsel submitted the July 15, 2011 report.

The problem, however, is that the expert admitted he had not finalized his opinions by July 15 and testified that he could not remember what he discussed with counsel during two pre-July 15 conversations. For the reasons already discussed, Terry has not adequately explained why he now remembers the substance of those conversations. Additionally, counsel chose not to fill in that factual gap with an affidavit of his own.[6] The result is that the Court is left with an unclear record, but one suggesting that counsel – not the expert – provided the substantive leadership in preparing the expert's report.

Under this factual record, exclusion is appropriate because it is the plaintiff who must prove that her failure to comply with expert disclosure rules was substantially justified or harmless. She has not done so here. She has not demonstrated that Terry actually prepared his own report, rather than simply adopting counsel's earlier disclosure.

---

[6] If Terry and counsel did indeed discuss Terry's impressions – or "viewpoints" – of the case on May 18 and/or July 12, counsel could have so indicated. Such an affidavit would be permissible because it would not contradict Terry's testimony. It would simply fill out the factual record. No such affidavit was filed, however.

The Court will therefore strike Mr. Terry's report in its entirety and will exclude Mr. Terry from testifying. This ruling moots Ohio National's alternative motion to strike portions of Mr. Terry's report. This ruling does bear on the motion to amend, but does not moot it. Expert testimony is just one factor the Court must examine in deciding whether to allow plaintiff to seek punitive damages; it is not dispositive.

## MOTION TO AMEND

Plaintiff seeks leave to add a punitive damages "claim" to her complaint but technically there is no such thing as a stand-alone punitive damages claim. A prayer for punitive damages must link to an underlying claim, such as a tort or breach of contract, and the conduct of the breaching party must meet the "threshold level of being oppressive and outrageous." *Boise Tower Assoc. LLC v. Washington Capital Joint Master Trust*, Case No. 03-141-S-MHW, 2006 WL 1749656 at * 12 (D. Idaho 2006) (applying Idaho law). Whether plaintiff should be allowed to amend her complaint to seek punitive damages is a substantive question controlled by Idaho law. *See Doe v. Cutter Biological*, 844 F. Supp. 602, 610 (D. Idaho 1994). The trial court decides, in its discretion, whether to submit the punitive damages issue to the jury. *See Manning v. Twin Falls Clinic & Hosp., Inc.*, 830 P.2d 1185, 1190 (Idaho 1992).

An award of punitive damages ultimately requires a bad act and a bad state of mind. *See Todd v. Sullivan Const. LLC*, 191 P.3d 196, 201 (Idaho 2008) (citing *Myers v. Workmen's Auto. Ins. Co.*, 95 P.3d 977, 985 (Idaho 2004)). The defendant must (1) act in a manner that was an extreme deviation from reasonable standards of conduct with an

understanding of – or disregard for – its likely consequences, and must (2) act with an extremely harmful state of mind, described variously as with malice, oppression, fraud, gross negligence, wantonness, deliberateness, or willfulness. *Myers,* 95 P.3d at 983.

At trial, plaintiff must satisfy this standard by clear and convincing evidence. Idaho Code § 6-1604(1). For purposes of the motion to amend, however, plaintiff does not need to meet this high burden; she need only show "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." Idaho Code § 6-1604(2).

Idaho Courts are generally reluctant to allow punitive damages in breach of contract cases, adhering to the principle that such damages "should be awarded cautiously and within narrow limits." *Cuddy Mountain Concrete Inc. v. Citadel Constr. Inc.*, 824 P.2d 151, 159 (Idaho 1992). To determine if a contractual breach is compelling enough to allow punitive damages, courts ask if the breaching party acted in bad faith or was oppressive, unreasonable, or irrational. *Id.* at 160. The Idaho Supreme Court summarized these general concerns as follows:

> The award of punitive damages in the context of a contractual relationship seems to be based on conduct which is unreasonable and irrational in the business context. The acts show a lack of professional regard for the consequences of the breach of the contractual agreement. . . . . If a party breaches its duty to act in good faith, it may be liable for . . . punitive damages.

*Cuddy Mountain Concrete Inc. v. Citadel Const., Inc.*, 824 P.2d 151, 160 (Idaho Ct. App. 1992).

In addition to these general concerns, the Idaho Supreme Court has laid out five specific factors that play a determinative role in deciding whether there is sufficient evidence to support a punitive damages award:

(1)     the presence of expert testimony;

(2)     whether the unreasonable conduct actually caused harm to the plaintiff;

(3)     whether there is a special relationship between the parties, as in the . . . insured-insurer relationship;

(4)     proof of a continuing course of oppressive conduct; and

(5)     proof of the actor's knowledge of the likely consequences of the conduct.

*Id.* at 160-61.

With these general and specific guidelines in mind, the Court concludes that plaintiff has established a reasonable likelihood of proving – by clear and convincing evidence – facts supporting a punitive damages award.  In this case, the bulk of the analysis focuses on the general concerns as well as the fourth specific factor – a continuing course of oppressive conduct.  Because the remaining factors are dispensed with more quickly, the Court will analyze them before turning to the lengthier discussion.

**1.     Expert Testimony**

Plaintiff will not present expert testimony for the reasons discussed.  The absence of expert testimony is not determinative, however.  *See Cuddy*, 824 P.2d at 161 (upholding a punitive damages award where no expert testimony was offered regarding the extent of the defendant's deviation from reasonable conduct).  A jury could conclude

– even without expert testimony – that Ohio National's conduct was an extreme deviation from the standards of reasonable conduct.

## 2.      Actual Harm

Plaintiff was harmed by Ohio National's conduct, in that the $2 million policy should have been paid. Further, a punitive damages award necessarily focuses primarily on the defendant's conduct, not the harm plaintiff suffered. Thus, "'nominal damages may support a punitive award.'" *Harwood v. Talbot*, 39 P.3d 612, 619 (Idaho 2001) (citation omitted).

## 3.      Special Relationship

The special relationship factor is easily established – Mr. Weekes and Ohio National were in a special relationship as insurer/insured. *See Cuddy*, 824 P.2d at 160-61.

## 4.      Knowledge

Based on the evidence described more thoroughly below, a jury could conclude that Ohio National acted with an extremely harmful state of mind, and with knowledge of the likely consequences of its conduct. Ohio National is in a superior position and obviously understands the import of failing to pay on a life insurance policy. As one court observed:

> In both first- and third-party situations the contract and the nature of the relationship effectively give the insurer an almost adjudicatory responsibility. The insurer evaluates the claim, determines whether it falls within the coverage provided, assesses its monetary value, decides on its validity and passes upon payment. Although the insured is not without remedies if he disagrees with the insurer, the very invocation of those remedies detracts significantly from the protection or security which was

the object of the transaction.

*White v. Unigard Mut. Ins. Co.*, 730 P.2d 1014, 1018 (Idaho 1986) (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 570-71 (Ariz. 1986)).

**5.      Oppressive, Unreasonable, or Irrational Behavior[7]**

Turning to the more general concerns identified above, plaintiff has presented sufficient evidence for a jury to conclude that Ohio National's conduct was oppressive, unreasonable, or irrational.

Most significantly, Ohio National argued that Mr. Weekes made "incorrect statements" or "misrepresentations" on his life insurance application.  This point is not even fairly debatable.  The application asked Mr. Weekes whether he would replace his existing life insurance policy.  He said, "Yes."  The application asked what the "Replacement Date" would be.  He put a dash mark.  There is no misrepresentation there, nor is there any incorrect statement.

Ohio National's related arguments are also seriously lacking.  For example, its interpretation of the word "replace" was unreasonable in light of the application itself as well as a governing Idaho Insurance regulation.  *See* Idaho Admin. Code r. 18.01.41.004. Similarly, Ohio National's mutual mistake argument lacked merit because there was no evidence whatever that Mr. Weekes assumed he could only have $2 million in

---

[7]    Many of the facts and legal authorities set forth here are discussed more fully in the Court's summary judgment ruling.  *See Order*, Dkt. 46.

outstanding life insurance.

Plaintiff also presented evidence that Ohio National stubbornly clung to one of its positions, even as the underlying facts appeared to collapse. To understand this point requires a return to Idaho Code § 41-1811, which the Court discussed more thoroughly in its November 21 Order granting summary judgment. *See* Dkt. 46, at 8-13.

Idaho Code § 41-1811 deals with representations made in the insurance application and implicitly permits insurance companies to deny coverage based on certain types of statements. For example, denial would be permissible if the insured made "misrepresentations" or "incorrect statements" in the application that were "material . . . to the insurance company's acceptance of risk," or caused the company to issue a policy that, in good faith, it would not have issued had the "true facts" been known. Idaho Code § 41-1811.

So in this case, to rescind the contract, Ohio National would first need to prove Mr. Weekes made an incorrect statement on his application. Then the company would have to prove it would not have issued the policy had it known the "true facts."

Ohio National insisted it never would have issued a $2 million life insurance policy to Mr. Weekes if he had another policy in place because he would have been over-insured. At the time, Ohio National's guidelines limited coverage to 25 times Mr. Weekes' earned income. Ohio National relied on a report from an outside company, Exam One, in concluding that Mr. Weekes' total income was $75,000. *See Exam One*

*Report, Ex. B to Hilverda Aff. (Dkt. 16-4)*, at 195. Per Ohio National's underwriting guidelines, that income level would limit Mr. Weekes to just under $2 million in life insurance (75,000 x 25 = 1,875,000). That would not leave any room for another insurance policy.

But Exam One's interview with Mr. Weekes was obviously incomplete, which is revealed in the following interview transcript:

Q:   Ok and then your salary is about how much Sir?

A:   I pay myself $35,000 a year.

Q:   *Ok and then bonuses anything in addition to that?*

A:   *Depending upon the year, yes.*

Q:   Ok. And then dividends and investments, do you take anything from that?

A:   They at this point are all re-invested.

Q:   Any personal rental properties?

A:   Yes I do.

Q:   Ok and how much do you receive net from that?

A:   Probably about 40,000 a year.

*Ex. F. to Hilverda Aff.* (Dkt. 16-8) at 807 (emphasis added).

There were no follow-up questions regarding bonuses, despite the fact that in the application, the agent estimated Mr. Weekes' net worth at $5 million, his net annual income as $200,000, and "all other income" as $40,000. *Life Ins. App. (Dkt. 16-4)*, at 163. Further, Ms. Weekes indicates that her husband's average annual income for the

five years preceding his death was $160,000, meaning he would qualify for $4 million in insurance coverage. *See Weekes Aff. (Dkt. 33-1)* ¶ 3.

Ohio National disputes the true amount of Mr. Weekes' income, but if the jury accepts plaintiff's version of the facts, this would support a finding that Ohio National engaged in a continuing course of oppressive conduct. *See Heller v. Farmers Alliance Mut. Ins. Co.*, 179 P.3d 276, 283 (Idaho 2008) (punitive damages award proper where "supported by competent and substantial, although conflicting, evidence").

Plaintiff has also pointed to other facts that could support a punitive damages award. For example, the jury could infer Ohio National assumed responsibility for terminating the other life insurance policy. Ohio National sent letters asking Mr. Weekes to complete forms that would allow the other policy to be terminated by way of a 1035 exchange. *See* I.R.C. § 1035 (governing "certain exchanges of insurance policies"). Even after both contracting parties were aware there would be no 1035 exchange, Weekes sent a "Request for Policy Surrender" (regarding the other life insurance policy) to Ohio National. Ohio National did nothing with that form. The company says it could not use the form, but it does not explain why this is so.

The jury could conclude that Ohio National would have done *something* with that form if it truly believed its policy would not become effective until the Beneficial Life policy terminated. Instead, Ohio National accepted the premium without making any further inquiries about the policy surrender form or the status of the other life insurance policy.

Finally, plaintiff asserts Ohio National knew the second policy would remain in place because the agent, Doug Hansen, was aware of this fact. Here, plaintiff relies on the general principle that an agent's knowledge will be imputed to the principal. *See Williams v. Continental Life & Accident Co.*, 593 P.2d 708, 709 (Idaho 1979).

The parties dispute whether Hansen merely brokered the deal (thus acting as Weekes' agent) or whether he acted as the company's agent. Ohio National appointed Hansen as its agent, but this is not necessarily determinative. As the Idaho Supreme Court long ago explained,

> "Where a person is unquestionably the agent of one party or the other in a transaction, but there is a dispute as to which party is his principal, the question is to be decided by a reference to all the facts and circumstances of the case. A proper interpretation of the facts may indicate that he was agent of one party although the contract recites or he testifies that he was the agent of the other."

*Harding v. Home Inv. & Sav. Co.*, 297 P. 1101, 1102 (Idaho 1930) (citation omitted).[8]

Additionally, the Idaho statute plaintiff cites does not foreclose a factual inquiry into Hansen's status. That statute simply forbids an insurance producer from acting as an agent for the insurer unless he is so appointed. *See* Idaho Code § 41-1018(1) ("An insurance producer shall not act as an agent of an insurer unless the insurance producer

---

[8] *Harding* is an old case, but it is good law. The basic principle announced there is in keeping with more current authority from other jurisdictions and a leading insurance law treatise. *See, e.g., Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 150 (1st Cir. 2004) ("When evaluating the role of an individual who assumes the characteristics of both agent and broker, we must 'look to the agent's conduct in the relevant transaction to determine the nature of the various relationships.'") (citing *Am. Country Ins. v. Bernhard Woodwork*, 592 N.E.2d 1319, 1323 (Mass. 1992)); 3 *Couch on Insurance* § 45:9 ("The question of whether a broker is the agent of the insured or of the insurer is ordinarily one of fact for determination by the jury.").

becomes an appointed agent of that insurer."). It does not necessarily prevent Hansen from acting as Weekes' agent.

Ultimately, a jury will decide whether Hansen acted as Ohio National's agent. If the jury concludes Hansen was Ohio National's agent, his knowledge could be imputed to the company, which would provide some additional support for a punitive damages award.

In sum, the facts of this case fit within that narrow set of cases where a punitive damages award would be supported by substantial evidence. The Court will grant plaintiff's motion to amend her complaint.

**IT IS ORDERED:**

1. Plaintiff's Motion to Amend Complaint to Include a Claim for Punitive Damages (Dkt. 17) is **GRANTED**.

2. Defendants' Motion to Strike the Affidavit of Tim Terry and Exclude Tim Terry as an Expert (Dkt. 25) is **GRANTED.**

3. Defendants' Motion to Strike Portions of the Affidavit of Tim Terry (Dkt. 24) is **MOOT.**

DATED: **December 9, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge